1

2

**JUST FOOD LAW PLLC**
Maia Kats (To be admitted *pro hac vice*)
maiakats@justfoodlaw.com
5335 Wisconsin Avenue, NW, Ste. 440
Washington, DC 20015
Telephone: (202) 243-7910

3

4

5

**KUZYK LAW, LLP**
Michael D. Braun (SBN 167416)
mdb@kuzykclassactions.com
2121 Avenue of the Stars, Ste. 800
Los Angeles, CA 90067
Telephone: (213) 401-4100
Facsimile: (213) 401-0311

6

7

8

9

10

*Counsel for Plaintiffs*

11

12

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

13

14

15

16

17

**IAN MCCAUSLAND, CARLO GARCIA,**
**and MICHAEL ZURL on behalf of**
**themselves and all others similarly situated,**

18

**Plaintiffs,**

19

v.

20

**PEPSICO, INC.,**

21

**Defendant**

| | |
|---|---|
| **CASE NO.:** | |
| **CLASS ACTION** | |
| **COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY, AND INJUNCTORY RELIEF** | |
| **DEMAND FOR JURY TRIAL** | |

22

23

24

25

26

27

28

Plaintiffs Ian Mccausland, Carlo Garcia, and Michael Zurl (together, Plaintiffs), individually and on behalf of all others similarly situated, bring this Class Action Complaint against PepsiCo, Inc. ("PepsiCo" or "Defendant"), and on the basis of personal knowledge, information and belief, and investigation of counsel, allege as follows:

## NATURE OF THE ACTION

1.      "Gatorade Protein Bars" are a food product manufactured, marketed, and sold, by PepsiCo.

2.      PepsiCo markets its Gatorade Protein Bars (the "Product" or "Bar") as a nutritious food for consumers comprised of ingredients that will build muscle, and thereby enhance athleticism and overall well-being.

3.      Individually as well as collectively, the marketing statements and claims of PepsiCo create a health halo around the Bar that leads reasonable consumers to perceive—by inference, omission, innuendo, and/or falsity—that the Product is good-for-you, and/or contributes to overall physical fitness and well-being; whereas in reality it contains excessive added sugars, which ingredient leading health authorities advise restricting or omitting from the diet in order to promote physical fitness and well-being.

4.      Specifically, PepsiCo markets a deceptive health halo for the Product by:

     a.   Naming it "PROTEIN BAR" as opposed to naming and labeling the Product a candy bar or dessert given that sugar is its principal characterizing ingredient;

     b.   Emblazoning the front label, known as the principal display panel ("PDP"), with the marketing statement "20 G Protein";

     c.   Carrying the marketing statement, "THE PROTEIN BAR PROVIDER," in super bolded, contrasting, and enlarged font on two side panels of the Product package, in addition to the marketing statement "PROTEIN TO HELP MUSCLES REBUILD";

     d.   Prominently plastering the PDP with symbols for professional baseball, basketball, and football players–thereby linking the Product with

exceptionally fit and healthy humans—along with logos, and/or endorsements, of the leading professional sports associations including the National Football League ("NFL"), National Basketball Association ("NBA"), Women's National Basketball Association ("WNBA"), and Major League Baseball ("MLB"); and

e.   Tapping into the good faith consumers place in the Gatorade brand and the Gatorade Sports Science Institute by carrying a large Gatorade brand symbol on the PDP.

5.      PepsiCo's health halo marketing of the Product goes beyond the label too. By way of example, on the Product's Amazon.com landing page, the Bar is aggressively marketed as:

a.   "Backed by Science";

b.   "Formulated and tested by the Gatorade Sports Science Institute";

c.   "Used by the Pros";

d.    "The Protein Bar Provider of the NFL, NBA, and MLB";

e.   among other deceptive statements connecting Product consumption with enhanced athleticism and overall well-being and health.

6.      In the minds of consumers, testing and formulation by the Gatorade Sports Science Institute ("GSSI") is a big positive for their athleticism, and/or well-being or health. Consumers understand the role of GSSI to be precisely as Gatorade markets it to be:

committed to helping athletes *optimize their health and performance* through research and education in hydration and *nutrition science*. The GSSI has experience working with some of the best practitioners, teams and athletes in the United States and across the globe. The provision of this service would not be possible without the translation of sports *nutrition research into sports nutriti*on practice.

\* \* \*

[GSSI] help[s] athletes *optimize their health and performance* through research, innovation, education and service in hydration and *nutrition science*.

7.     In fact, GSSI was founded and is funded by PepsiCo, the second largest food and beverage company in the world, and advances PepsiCo's commercial interests.

8.     Collectively as well as individually, PepsiCo's health halo marketing statements are false, deceptive, and unlawful, including with respect to material omissions about the Product's primary characterizing ingredient—added sugars. Contrary to benefitting consumers' health and/or their workouts, excess added sugars have deleterious effects on athleticism (fitness) and overall well-being according to the leading health authorities.

9.     Despite emblazoning the PDP with claims that the Product has 20 grams of protein, and naming it "PROTEIN BAR," **the Product has 30% more sugar by weight than it does protein**—or 29 grams (with 28 grams of added sugars). Twenty-nine grams is equivalent to approximately **7.25 teaspoons of added sugars in a single serving**.

10.     According to the American Heart Association, the maximum amount of added sugars that adult women and children should consume per day is 6 teaspoons, or approximately 24 grams – across the entirety of one's diet. For men, the maximum recommended amount is 9 teaspoons or 36 grams per day.[1] **A single serving of Gatorade Protein Bars *exceeds* that recommended added sugar daily ceiling for women and children, and amounts to 78% of the total recommended daily limit for men.**

11.     Instead of good nutrition for muscles, the body, fitness, athleticism, and/or health, consuming high levels of added sugars links with obesity, diabetes, and cardiovascular disease according to the leading health authorities—which therefore recommend restricting or omitting intake of added sugars.

12.     Obesity, diabetes, and cardiovascular disease are critical medical conditions.

---

[1] *See, e.g.,* AMERICAN HEART ASSOCIATION, https://www.heart.org/en/healthy-living/healthy-eating/eat-smart/sugar/how-much-sugar-is-too-much (last visited March 22, 2023).

13.     Indeed, obesity and type-2 diabetes, largely a function of diet, have officially reached pandemic levels in the United States. Diabetes is commonly called the "Other Pandemic"; unlike Covid-19, however, it shows no signs of slowing.[2]

14.     Plaintiffs would not have purchased, purchased as many of, or paid as much for Gatorade Protein Bars had the Product been marketed transparently—that is, as an excessively high added sugar candy or junk food the consumption of which health authorities recommend eliminating and/or limiting because of associated health risks.

15.     Indeed, **Gatorade Protein Bars contain more added sugar than the typical candy bar (*e.g.* Snickers, among others) and 4.5 more teaspoons of sugar per serving than a Dunkin' chocolate frosted donut with sprinkles** (28 grams as contrasted with 10.5 grams in the donut— almost 3 times the added sugar, in fact).[3]

16.     At bottom, Gatorade Protein Bars are artificially fortified junk food intended to entice unwitting health-conscious consumers into believing that purchasing and eating them is a net benefit to their health and/or athleticism when in truth they are consuming a nutrient they have *no need* to supplement in their diet—protein—along with approximately 7¼ teaspoons of added sugars.

---

[2] *E.g.,* Jane Caldwell, *Diabetes: The Other Pandemic*, Abbott Viewpoints (July 22, 2022) https://www.globalpointofcare.abbott/us/en/knowledge-insights/viewpoints/diabetes-the-other-pandemic.html#:~:text=It%20is%2C%20therefore%2C%20aptly%20named,in%2010%20American s%20has%20diabetes.&text=8.5%20million%20were%20undiagnosed%2C%20according,American %20Diabetes%20Association%20(ADA).

[3] *See, e.g.,* FOODUCATE, https://www.fooducate.com/product/Dunkin-Donuts-Chocolate-Frosted-Donut-with-Sprinkles/52D85125-1AA3-E1F8-4693-B492F5DDD5AD (last accessed July 18, 2023).

**JURISDICTION**

17.     This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and more than two-thirds of the members of the Class reside in states other than the state of which Defendant is a citizen.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events and misrepresentations giving rise to Plaintiffs' claims occurred in this District, and Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets of this District through the promotion, marketing, distribution and sale of its products here, (2) resides in this District, and (3) is subject to personal jurisdiction in this District.

19.      Pursuant to Civil Local Rule 3-2(c), an intra-district assignment to the San Jose Division is appropriate because a substantial part of the events or omissions which give rise to the claims asserted herein occurred in this Division, including that Plaintiff Mccausland made purchases of Gatorade Protein Bars in San Jose, Santa Clara County, from Amazon.com.

**PARTIES**

20.     Plaintiff Ian Mccausland is a resident of the City of San Jose, California.

21.     During the Class Period (as defined below), he purchased Gatorade Protein Bars in California for personal, family, and/or household use. Mr. Mccausland considers himself a fitness enthusiast.

22.     Mr. Mccausland purchased Gatorade Protein Bars from Amazon.com on November 30, 2022, December 6, 2022, March 25, 2023, June 4, 2023, and July 6, 2023.

23.     The label touted claims of and/or equivalent to "PROTEIN BAR" in large, bolded letters, "20 g of Protein," and contained logos for the NFL, NBA, WNBA, and MLB sports leagues, and the side labels in oversized bolded and capitalized letters, stated "PROTEIN TO HELP MUSCLES REBUILD."

24.     The Amazon.com landing page made similar claims, including that the Product is "backed by science," and the choice of "Pros."

25.     Mr. Mccausland saw and relied on these and like representations, individually and collectively, as well as the trust he placed in the Gatorade brand, when he purchased Gatorade Protein Bars.

26.     Mr. Mccausland believed that consuming Gatorade Protein Bars would be a clear benefit to his muscles and athleticism—and overall health thereby—as opposed to a Product with excessive total and/or added sugars the consumption of which is discouraged by health authorities given their link with ill-health and disease.

27.     Mr. Mccausland was not familiar with how many grams of sugar are in a teaspoon and/or what limits on added sugar daily intake the health authorities recommend. Nor did he understand the potential for negative health effects associated with regularly consuming Gatorade Protein Bars.

28.     Mr. Mccausland would not have purchased Gatorade Protein Bars, as many of them, and/or would have paid less for the Products, had he understood their actual nutritional character and/or that they contained 7.25 teaspoons of total sugars—or approximately 7 teaspoons of added sugars—in a single serving.

29.     Consequently, Mr. Mccausland lost money as a result of PepsiCo's misleading and unlawful marketing.

30.     Mr. Mccausland would consider purchasing the Product again were it marketed in a non-misleading and lawful manner such that he could trust the marketing claims.

31.     Plaintiff Michael Zurl is a resident of Remsenburg, New York.

32.     During the Class period (as defined below), he purchased Gatorade Protein Bars in New York for personal, family, and/or household use. Mr. Zurl considers himself a fitness enthusiast.

33.     Mr. Zurl purchased Gatorade Protein Bars from Amazon.com on March 23, 2020, April 17, 2020, May 8, 2020, May 20, 2020, June 17, 2020, July 20, 2020, August 29, 2020, December 28, 2021, March 15, 2022, March 30, 2022, as well as on other dates.

34. The label package touted claims of and/or equivalent to "PROTEIN BAR" in large, bolded letters, "20 g of Protein," and contained logos for the NFL, NBA, WNBA, and MLB sports leagues, and the side labels in oversized bolded and capitalized letters, stated "PROTEIN TO HELP MUSCLES REBUILD."

35. The Amazon.com landing page made similar claims, including that the Product is "backed by science," and the choice of "Pros."

36. Mr. Zurl saw and relied on these and like representations, individually and collectively, as well as the trust he placed in the Gatorade brand, when he purchased Gatorade Protein Bars.

37. Mr. Zurl believed that consuming Gatorade Protein Bars would be beneficial to his muscles and athleticism—and overall health thereby—as opposed a Product with excessive total and/or added sugars the consumption of which is discouraged by health authorities given their association with ill-health and disease.

38. Mr. Zurl was not familiar with how many grams of sugar are in a teaspoon and/or what limits on added sugar daily intake the health authorities recommend. Nor did he understand the potential for negative health effects associated with regularly consuming Gatorade Protein Bars.

39. Mr. Zurl would not have purchased Gatorade Protein Bars, as many of them, and/or would have paid less for the Product, had he understood its actual nutritional character and/or that it contained 7.25 teaspoons of total sugars—or approximately 7 teaspoons of added sugars--in a single serving.

40. Consequently, Mr. Zurl lost money as a result of PepsiCo's misleading and unlawful marketing.

41. Mr. Zurl would consider purchasing the Product again were it marketed in a non-misleading and lawful manner such that he could trust the marketing claims.

42. Plaintiff Carlo Garcia is a resident of the City of Sanger, California.

43. During the Class period (as defined below), he purchased Gatorade Protein Bars in California for personal, family, and/or household use. Mr. Garcia considers himself a fitness enthusiast.

44.     Mr. Garcia purchased Gatorade Protein Bars from Amazon.com on June 21, and August 19, 2020.

45.     The label touted claims of and/or equivalent to "PROTEIN BAR" in large, bolded letters, "20 g of Protein," and contained logos for the NFL, NBA, WNBA, and MLB sports leagues, and the side labels in oversized bolded and capitalized letters, stated "PROTEIN TO HELP MUSCLES REBUILD."

46.     The Amazon.com landing page made similar claims, including that the Product is "backed by science," and the choice of "Pros."

47.     Mr. Garcia saw and relied on these and like representations, individually and collectively, as well as the trust he placed in the Gatorade brand, when he purchased Gatorade Protein Bars.

48.     Mr. Garcia believed that consuming Gatorade Protein Bars would be a clear benefit to his muscles and athleticism—and overall health thereby—as opposed to a product with excessive total and/or added sugars the consumption of which is discouraged by health authorities given their link with ill-health and disease.

49.     Mr. Garcia was not familiar with how many grams of sugar are in a teaspoon and/or what limits on added sugar daily intake the health authorities recommend. Nor did he understand the potential for negative health effects associated with regularly consuming Gatorade Protein Bars.

50.     Mr. Garcia would not have purchased Gatorade Protein Bars, as many of them, and/or would have paid less for the Product, had he understood its actual nutritional character and/or that it contained 7.25 teaspoons of sugar—or approximately 7 teaspoons of added sugars—in a single serving.

51.     Consequently, Mr. Garcia lost money as a result of PepsiCo's misleading and unlawful marketing.

52.     Mr. Garcia would consider purchasing the Product again were it marketed in a non-misleading and lawful manner such that he could trust the marketing claims.

53.     Defendant PepsiCo, Inc., is a public corporation organized and existing under the laws of the State of North Carolina. PepsiCo's principal place of business is at 700 Anderson Hill

Road, Purchase, New York, 10577. PepsiCo is one of the world's largest food companies, with an annual revenue in 2022 of $86.4 billion. Gatorade is a wholly owned division of PepsiCo.

## FACTUAL ALLEGATIONS

54.     PepsiCo's Gatorade Protein Bar marketing is deceptive, misleading, and unlawful, because both individually and collectively the health halo marketing claims, including the Product name, imply that the Product is a fitness enhancer and/or healthful Product that promotes athleticism and well-being when, in fact, it contains high levels of total and added sugars.

55.     Leading health authorities advise that the consumption of high levels of added sugars links with serious medical conditions, including obesity, diabetes, and cardiovascular disease, and therefore recommend reducing and/or limiting their consumption.

56.     Unlike marketing large amounts of added sugars, which health conscious consumers seek to avoid, marketing the inclusion of protein as a nutrient in products appeals to consumers and exponentially increases sales.

57.     Even though as a scientific matter "***protein deficiency is almost unheard of in the United States***,"[4] consumers mistakenly perceive that adding more protein to their diet is important to their health and well-being. Because of this advertising-led misperception, global annual protein sales are skyrocketing and expected to reach $70 billion by 2025.[5]

---

[4] PHYSICIAN'S COMMITTEE FOR RESPONSIBLE MEDICINE, *The Protein Myth: Fact Sheet,* https://www.pcrm.org/good-nutrition/nutrition-information/protein#:~:text=Protein%20deficiency%20is%20almost%20unheard,get%20more%20than%20enough%20protein (last visited March 23, 2023).

[5] FOOD AND BEVERAGE INSIDER, *3 Trends Shaping Protein Formulation to Meet Consumer Needs*, https://www.foodbeverageinsider.com/protein/3-trends-shaping-protein-formulation-meet-consumer-needs (last visited March 23, 2023).

58.     PepsiCo, with its Gatorade Protein Bars, capitalizes on this fraudulent advertising trend—with intensive and misleading marketing about the purported benefits of protein and/or the advantages of consuming its protein-fortified Product to enhance general fitness, athleticism and impliedly, overall well-being and/or health—all notwithstanding its high added sugars content.

### *PepsiCo's Unlawful and Deceptive Product Name & General Marketing Scheme*

59.     As part of its deception, PepsiCo includes the word protein in the Product name—PROTEIN BAR—without any reference to the Product's primary characterizing ingredient—sugar. **But the Product has approximately 30% more sugar by weight than protein (29 vs. 20 grams).**

60.     The Product packaging also contains numerous highly prominent (bolded, high contrast, enlarged, capitalized fonts) protein claims, including "20G PROTEIN," "PROTEIN TO HELP MUSCLES REBUILD," "high quality whey," made to "replenish and rebuild muscles," and "THE PROTEIN BAR PROVIDER."

61.     Surrounding marketing, including on Amazon.com, likewise trumpets the Product's protein content and the purported scientific substantiation for the Product's health benefits (including enhanced athleticism and overall well-being), such as claims of "Backed by Science," "Gatorade Sports Science Institute," and "Used by the Pros," along with logos for and claims of use by the NFL, MBL, NBA, and MNBA. *See, e.g.,* Images 1 – 6. Image 7 is of an in-store shelf display.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Images 1-6





COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY, AND INJUNCTIVE RELIEF



**Gatorade Whey Protein Bars**







**Built to Replenish**
Made with 20 grams of high quality whey and milk protein to help replenish and rebuild your muscles for athletic recovery.

**Backed by Science**
All products are formulated and tested at the Gatorade Sports Science Institute.

**Used by the Pros**
Gatorade is the Protein Bar Provider of the NFL, NBA, and MLB.





Image 7



62.    With respect to the Gatorade Sports Science Institute and PepsiCo's science-related claims ("Backed by Science," "Formulated and tested at the Gatorade Sports Science Institute"), PepsiCo founded and funds the Gatorade Sports Science Institute ("GSSI"), whose mission it publicly markets is "***to optimize the health and performance of athletes through research and development, innovation, education and sports science service***."[6]

---

[6] PRN, *The State-of-the-Art Gatorade Sports Science Institute Joins PepsiCo's R&D Center of Excellence in Valhalla, NY to Strengthen a World-Class Campus for End-to-End Innovation* (June 5, 2003), https://www.prnewswire.com/news-releases/gatorade-unveils-new-sports-science-lab-for-extensive-athlete-research-and-new-product-innovation-301841799.html.

63.     The Gatorade Sports Science Institute is operated by PepsiCo and is, owing to its promotion and name, reasonably intertwined with Gatorade in the minds of consumers. GSSI's work is perceived by consumers to be science-based and undertaken for the purposes of advancing nutrition and well-being. It is marketed by PepsiCo as:

> committed to helping athletes **optimize their health** and performance through research and education in hydration and **nutrition science**. The GSSI has experience working with some of the best practitioners, teams and athletes in the United States and across the globe. The provision of this service would not be possible without the translation of sports nutrition research into sports **nutrition practice**.

64.     In addition to the foregoing, while PepsiCo declares on the PDP in clear and understandable statements what percentage of the recommended daily limit of fat and sodium are contained in one serving of the Product—known as the Recommended Daily Value or "%DV"—PepsiCo omits—or does not make—a like statement for added sugars.

65.     Nor does PepsiCo indicate by way of teaspoons the added sugars content on the Product PDP—statements that average consumers would, alternatively to %DV, understand, find material, and be concerned by.

66.     Instead, unlike its PDP labeling of sodium and fat %DVs, PepsiCo buries the %DV of added sugars on the back label in fine, tiny print where consumers do not read it.

67.     Consumers find front package labels (PDPs) that present added sugar contents in terms of %DVs—as PepsiCo does for fat and sodium levels—and/or teaspoons, to be relatable, clear, and effective.[7]

68.     Average consumers, as is the case with the Plaintiffs, who trust in Gatorade and its marketing, are not sufficiently nutritionally literate, or sophisticated scientifically, to comprehend that the amount of added sugars in the Product is high and/or excessive, and/or to understand that the leading health authorities advise against the consumption of added sugars at such levels given links

---

[7] C. Miller *et al.*, *You can't just eat 16 teaspoons of sugar. . .,* BMC PUBLIC HEALTH (2022; 22: 1241), https://pubmed.ncbi.nlm.nih.gov/35733102/.

to disease—particularly when presented with Gatorade/ PepsiCo's health halo marketing about protein levels and the Product overall.[8]

69.    The majority of consumers have no idea how many grams of added sugars are in a teaspoon (a relatable measure), or how many grams the leading authorities believe to be excessive and harmful.

### *Authorities' Statements on Added Sugars and Nutritional Science, and Related Facts*

70.    PepsiCo capitalizes on its marketing of Gatorade Protein Bars as healthful and/or beneficial to overall athleticism and well-being, trumpeting its protein content. Foods that are marketed as good for you appeal to increasingly health-conscious consumers, and equally, according to Nielsen's 2015 Global Health & Wellness Survey, "88% of those polled are willing to pay more for healthier foods."

71.    As for protein bars—dubbed Frankenfood by nutritionist scientists for their fat, salt, and added sugar content—the global market is anticipated to swell to more than $2 billion by 2026, even though "[y]ou'd be hard-pressed to find an American who actually needs more protein."[9]

72.    "'People [] instinctively associate protein with fitness.' When they eat protein bars, 'people think they're doing something good for their health.'"[10]

73.    But whereas protein deficiency is *not* a genuine or reasonable health concern in the United States,[11] obesity, diabetes, and cardiovascular disease are. Indeed, obesity and diabetes are official *pandemics* in the United States, and cardiovascular disease is closing in—with even the Armed Forces reporting an inability to recruit sufficient numbers of healthy youth to the military.

---

[8] *Id.*

[9] Dani Blu, *Are Protein Bars Actually Good For You?,* N.Y. TIMES, Jan. 12, 2023, https://www.nytimes.com/2023/01/12/well/eat/protein-bars.html?smid=nytcore-ios-share&referringSource=articleShare (quoting Eric Rimm, professor of epidemiology and nutrition at the Harvard T.H. Chan School of Public Health).

[10] *Id.* (quoting Marion Nestle, professor of nutrition, food studies, and health at New York University).

[11] *See supra* FN 4.

74.     Indeed, reports are that 77% of Americans in the 17-24 age bracket are not eligible for military service due to a variety of factors. Being overweight is the biggest individual disqualifier.[12]

75.     More generally, the U.S. Obesity Prevalence was 41.9% from 2017-2020. Overall, college-educated populations have significantly lower obesity rates than others, and minority groups have higher rates, including overall 49.9% for African American adults and 45.6% for Latino adults.[13] These latter groups also have lower nutritional literacy, and are more susceptible therefore to deceptive and misleading marketing of fortified junk food.

76.     With respect to diabetes, rates have doubled over the last 20 years, with more than 37 million people diagnosed with diabetes today (one in five), and another 96 million (one in three) who are pre-diabetic (a serious health condition that leads to diabetes without intervention). Many of those who are diabetic as well as prediabetic are undiagnosed.[14] Estimate are that the United States will soon hit the point where 50% of the population is either diabetic or pre-diabetic—constituting something like an atomic bomb for public health and public coffers.

77.     Medical complications of obesity and/or diabetes include cardiovascular disease, amputation, vision impairment, kidney disease, and death.[15] Related public treasury costs—for health care, disability benefits, and premature death—are estimated to be in the billions annually.

---

[12]  Stephen A. Cheney, *Obesity's Increasing Threat to Military Readiness: The Challenge to U. S. National Security*, AMERICAN SECURITY PROJECT 2022, https://www.jstor.org/stable/pdf/resrep46869.pdf?refreqid=excelsior%3A6e2957e4ee9a2cf85140541540e847b1&ab_segments=&origin=&initiator=&acceptTC=1 (last accessed July 17, 2023).

[13] CENTERS FOR DISEASE CONTROL AND PREVENTION, *Adult Obesity Facts*, https://www.cdc.gov/obesity/data/adult.html (last visited March 29, 2023).

[14] CENTERS FOR DISEASE CONTROL AND PREVENTION, *Pre-Diabetes,* https://www.cdc.gov/diabetes/basics/prediabetes.html (last visited March 29, 2023).

[15] CENTERS FOR DISEASE CONTROL AND PREVENTION, *Diabetes: Coexisting Conditions and Complications,*  https://www.cdc.gov/diabetes/data/statistics-report/coexisting-conditions-complications.html (last visited March 29, 2023).

1  According to the American Diabetes Association, the total cost for diabetes in 2017 alone was

2  approximately $403.9 billion.[16]

3      78.    Consumption of excessive added sugars correlates with obesity, diabetes, and other

4  related medical conditions including cardiovascular disease and certain cancers, according to the

5  Centers for Disease Control and Prevention ("CDC") and other reputable health authorities. For this

6  reason, CDC findings and recommendations are that-

7

8          Americans are eating and drinking too many added sugars, which can contribute to
        health problems such as weight gain and obesity, type 2 diabetes, and heart disease.

9          To live healthier, longer lives, most Americans need to move more and eat better,
        **including consuming** <u>fewer added sugars</u>.[17]

10

11      79.    Because of this, "a leading health indicator for [the CDC's] Healthy People 2030 is to

12  reduce consumption of added sugars by people aged 2 and older."[18]

13      80.    Other health authorities similarly advise limiting sugar intake, including the World

14  Health Organization ("WHO"). According to the WHO, significant health benefits are derived from

15  limiting total sugars to 5% or less of daily caloric intake.[19] This is consistent with the

16  recommendation of the Advisory Panel to the U.S. Dietary Guidelines Committee, which suggested

17  in 2020 that daily added sugar intake be reduced to 6% or less of total calories—meaning 120

18

19

20

21

22  [16] Joan O'Connell, Spero m. Manson, *Understanding the Economic Costs of Diabetes and Prediabetes and What We May Learn About Reducing the Health and Economic Burden of* these *Conditions*, DIABETES CARE (2019 September; 42(9)),
23  https://www.ncbi.nlm.nih.gov/pmc/articles/PMC67026111609–1611.

24  [17] https://www.cdc.gov/nutrition/data-statistics/added-sugars.html (last visited July 17, 2023).

25  [18] Weeratunga, P., Jayasinghe, S., Perera, Y. *et al.* Per capita sugar consumption and prevalence of diabetes mellitus – global and regional associations. *BMC Public Health* 14, 186 (2014),
26  https://doi.org/10.1186/1471-2458-14-186.

27  [19] WORLD HEALTH ORGANIZATION, *Healthy Diet* (April 29, 2020), https://www.who.int/news-room/fact-sheets/detail/healthy-diet.

28

calories per 2,000 calorie diet (although the Trump Administration rejected this recommendation and retained a slightly higher figure of 10% of total calories).[20]

81.    The U.S. Office of Disease Prevention and Health Promotion also recommends a reduction in added sugars, explaining in a publication entitled "**Cut Down on Added Sugars**," that "[c]hoosing a healthy eating pattern low in added sugars can have important health benefits."[21]

82.    In the words of the 2015 U.S. Dietary Guidelines Advisory Committee, "[s]trong and consistent evidence shows that intake of added sugars from food and/or sugar sweetened beverages are associated with excess body weight in children and adults." It similarly found that **"[s]trong evidence shows that higher consumption of added sugars. . . increases the risk of type 2 diabetes among adults and this relationship is not fully explained by body weight**."[22]

83.    American's intake of processed foods is the largest contributor to increased dietary rates of added sugars in the U.S. Processed foods—notwithstanding any health halo marketing—account for more than 92% of added sugars in the diets of children, for example, with approximately 71% exceeding the daily recommended limits on added sugars.[23]

---

[20] IFT, *U.S. Dietary Guidelines Committee recommends lowering added sugar consumption* ("The 2020 DGAC revisited this topic and concluded that a more appropriate target to help mitigate cardiovascular disease and obesity is to lower the number . . . from added sugars"), https://www.ift.org/news-and-publications/news/2020/july/16/us-dietary-guidelines-committee-recommends-lowering-added-sugar-consumption.

[21] DIETARY GUIDELINES FOR AMERICANS (8th Ed.), https://health.gov/sites/default/files/2019-10/DGA_Cut-Down-On-Added-Sugars.pdf (last visited July 14, 2023).

[22] U.S. DEPT. OF HEALTH & HUMAN SERV. & U.S. DEPT. OF AGRIC., *Scientific Report of the 2015 Dietary Guidelines Advisory Committee*, at 342-43, (2015), https://health.gov/dietaryguidelines/2015-scientific-report/PDFs/Scientific-Report-of-the-2015-Dietary-Guidelines-Advisory-Committee.pdf.

[23] Daniela Nehri, *et. al*, *Consumption of ultra-processed foods and its association with added sugar content in the diets of US children*, *NHANES 2009-20*14," July 30, 2019 Pediatric Obesity, available at https://pubmed.ncbi.nlm.nih.gov/31364315/.

84.     Hidden—or unrecognized—added sugars in processed packaged foods account for a large percentage of these, including from so-called health or energy bars.[24]

85.     Because of the harmful health implications, the American Heart Association ("AHA") recommends no more than six (6) teaspoons of added sugar a day for women and children across their entire daily dietary intake, and nine (9) for men. *See supra* n. 1.

86.     A single Gatorade Protein Bar (one serving) contains 28 grams of added sugars and 29 grams of total sugars, the equivalent of approximately 7.25 teaspoons of sugar (divide grams by four to approximate the number of teaspoons).

87.     Put another way, **a single serving of the Product—one Gatorade Protein Bar—exceeds the daily, health-based limits for added sugars recommended by the AHA for women and youth, and approaches it for men**.

***PepsiCo's Conduct Violates Multiple Statutory Provisions, Official Policies, and Regulations Targeting Deceptive Marketing—Strongly Supporting Plaintiffs' Claims***

88.     Both federal and state health authorities have promulgated policies and regulations targeting deceptive advertising of foods—and in particular, fortified junk foods like Gatorade Protein Bars that masquerade as health or good-for-you foods.

89.     In addition to prohibiting deceptive business practices and false advertising, both New York and California laws incorporate parallel federal principles and/or provisions into their consumer protection statutes—namely New York's General Business Law Sections 349 and 350, and California's Sherman Act, Unfair Competition Law ("UCL"), California Business and Professions Code § 17200 *et seq*., California Consumer Legal Remedies Act ("CLRA"), California Civil Code § 1750 *et seq*., and California False Advertising Law, California Business and Professions Code § 17500.

---

[24] NBC News, *Are Sneaky Sugars Hiding in Your Food*, https://www.nbcnews.com/better/lifestyle/are-sneaky-sugars-hiding-your-food-use-these-healthy-swaps-ncna1135041 (last accessed July 17, 2023).

### Section 343 of the Federal Food, Drug and Cosmetic Act

90.     First and foremost, Section 343 of the Federal Food, Drug and Cosmetic Act (FFDCA) provides that a food is "misbranded . . . (a) if (1) its labeling is false or misleading in any particular." This includes deception by way of inference, innuendo, and/or omission—as is the case with Gatorade Protein Bars given their deceptive health halo.

91.     As set forth above, PepsiCo's marketing misleads consumers about the true qualities and characteristics of Gatorade Protein Bars—which, instead of enhancing athleticism and/or overall fitness and well-being by providing essential nutrients that its consumers are missing and/or which they require to build muscle—a claim that PepsiCo markets as supported by sports science no less— is instead saturated with added sugars. Added sugars, moreover, are stated by leading and reputable health authorities to correlate with obesity, diabetes, and cardiovascular disease, and therefore recommended by the same to be omitted from or limited in the diet.

### 21 C.F.R. § 102.5

92.     Additionally intended to prevent deception, Federal Food & Drug Administration ("FDA") regulations require that foods be named after their characterizing ingredients—which in this case is (or at the least includes) sugar—the dominant ingredient in Gatorade Protein Bars.

93.     More specifically, 21 C.F.R. § 102.5 provides that:

> (a)     The common or usual name of a <u>food</u> *shall* include a statement of the presence . . . of any characterizing ingredient(s) or component(s) . . . when the presence . . . of such ingredient(s) or component(s) in the *food* has a material bearing on price or consumer acceptance. . . .

21 C.F.R. § 102.5 (emphasis in original).

94.     So too, the FDA mandates that t**he** PDP shall bear as one of its principal features a statement of the identity of the commodity. 21 C.F.R. § 101.3(a)-(b). Such statement of identity shall be in terms of the common or usual name of the food. *Id.* In other words, sugar—more so than protein—needs to be conspicuously referenced in the Product name on the PDP.

95.     While named "PROTEIN BAR," the Gatorade Protein Bars have **30% more sugar by weight than they do protein**, yet PepsiCo fails to reference sugar in the name Protein Bar—let alone lead with it.

96.     To the contrary, PepsiCo omits any reference to sugar as the key characterizing ingredient from the Protein Bar name, and then piles on the deception with multiple other protein-related health and wellbeing claims, such as "Backed by Science," along with emblazoning the logos of professional sports leagues—who members are virtually the fittest people on the planet—on the Product's PDP.

### The Jelly Bean Rule

97.     The Product also runs afoul of the FDA's policy against the "random fortification of foods," including nutrient fortification of "sugars; or snacks; or snack foods such as candies" because it could "result in deceptive or misleading claims for certain foods."  21 C.F.R. § 104.20.

98.     The FDA opposes fortification of sugar foods precisely because the practice can "mislead" the public to consume unhealthy foods believing, given labeling claims, that they are healthful. *Id.*, § 104.20(a).

99.     The policy against fortification of junk foods otherwise known as the "Jelly Bean Rule," is egregiously violated here.

### FDA's Draft Policy on Dietary Guidance Statements

100.     Finally, the FDA Draft Policy on Dietary Guidance Statements similarly seeks to prevent deceptive marketing of junk foods by limiting foods that use dietary guidance statements about protein (and other nutrients) in their marketing to those foods **that have fewer than 10%DV, or 5 grams, of added sugars. Gatorade Protein Bars have 28 grams of added sugars.** *See* Image 8. Again, instead of 5 grams, Gatorade Protein Bars have 29 grams of sugars, and 28 grams of added sugars.

Image 8

**Appendix 3. Recommendations for Products Bearing Dietary Guidance Statements**

| Product | The subject of the DGS is... | Then the food group equivalent (FGE) recommendation is... | And the recommended saturated fat level per RACC is... | The recommended sodium level per RACC is... | The recommended added sugar level per RACC is... |
|---|---|---|---|---|---|
| Individual food | A food, food group, or the entire food product | At least 1 FGE per RACC from 1 food group | 10% DV (2 g) | 15% DV (345 mg) | 10% DV (5 g) |

101.    In the words of the FDA:

> Healthy dietary patterns can accommodate nutrient-dense foods with small amounts of added sugars. However, as the amount of added sugars increases in the diet, it becomes more difficult to stay within calorie limits. To help Americans identify foods lower in added sugars while also ensuring that a variety of products fall below the recommended added sugars level for products bearing Dietary Guidance Statements, we recommend that individual foods (including mixed products as described in Section VI, Question 6) bearing Dietary Guidance Statements not contain more than 10 percent of the DV for added sugars (5 grams) per RACC.[25]

102.    While in draft form yet and not binding, the document clearly evinces the FDA's own expert thinking on consumer fraud and consumer susceptibility to fraud when foods high in added sugars (defined as anything over 5 grams per serving) are fortified with nutrients and then packaged and marketed as healthy and/or nutritious and/or good-for-you foods—precisely as PepsiCo's does with Gatorade Protein Bars.

103.    As the Guidance says elsewhere, just as with the Jelly Bean Rule, the FDA's impetus for such restrictions is that exceeding recommended levels "may cause consumers to believe that the product will contribute to a diet that promotes better health, when, in fact, the product contains levels of certain nutrients that are inconsistent with nutritious dietary patterns." *Id.*, 26.

### ***Comparators and Competitors***

104.    **Notably, Gatorade Protein Bars Products have 30% more calories and two more grams of added sugar than a Snickers Candy Bar.**[26]

105.    A KitKat Bar has 14 grams of added sugar—that is, 50% less added sugar than a Gatorade Protein Bar.[27]

---

[25] FDA Draft Guidance on Dietary Guidance Statements, at 29 (March 2023), available at https://www.fda.gov/media/166342/download?attachment.

[26] SNICKERS, https://www.snickers.com/products/chocolate/snickers-singles-size-chocolate-candy-bars-186-oz-bars (last visited March 27, 2023).

[27] HERSHEY, https://www.hersheyland.com/products/kit-kat-milk-chocolate-king-size-candy-bar-3-oz.html (last visited March 27, 2023).

106. Almost incomprehensively, even **a chocolate frosted Dunkin Donut with sprinkles has nearly 3 times fewer grams of added sugars than a Gatorade Protein Bar, that is, 28 grams for the Gatorade Protein Bar as contrasted with 10.5 grams in the donut**.

107. By corollary, leading competitor "protein bars" have dramatically fewer grams of added sugar than Gatorade Protein Bars.

108. KIND PROTEIN Bars, Dark Chocolate variety, have a mere 6 grams of added sugars—22 fewer grams of added sugars than Gatorade Protein Bars.[28]

109. RXBAR Protein Bars, Chocolate Sea Salt variety, have zero grams of added sugars—28 fewer grams (7 teaspoons) of added sugars than Gatorade Protein Bars.[29]

110. Quest Protein Bars, Chocolate Chip Cookie Dough variety, have zero grams of added sugars—28 fewer grams of added sugars than Gatorade Protein Bars—and one gram of total sugars.[30]

111. Think Protein Bars—in like varieties—also have zero grams of added sugar.[31]

112. Gatorade Protein Bars are protein-fortified sugar or snack foods, which deceive consumers into believing that they are consuming a healthful food when in fact they are consuming junk food.

---

[28] KIND, https://www.kindsnacks.com/protein-bars/dark-chocolate-nut-M20802.html (last visited March 27, 2023).

[29] AMAZON, https://www.amazon.com/RXBAR-Whole-Protein-Chocolate-Ounce/dp/B0143NQVQ6/ref=sr_1_7?keywords=rx+bars&qid=1679952549&sr=8-7 (last visited March 27, 2023).

[30] AMAZON, https://www.amazon.com/Quest-Nutrition-Chocolate-Protein-Friendly/dp/B00DLDH1N2?source=ps-sl-shoppingads-lpcontext&ref_=fplfs&psc=1&smid=ATVPDKIKX0DER (last visited March 28, 2023).

[31] https://shop.thinkproducts.com/think-High-Protein-Bar-Brownie-Crunch/p/TKP-701271&c=ThinkProducts@ThinkThinHPB (last visited March 30, 2023).

### ***Reliance and Economic Injury***

113.    When purchasing Gatorade Protein Bars, Plaintiffs sought a product that would increase their athleticism and by inference, their overall well-being and health.

114.    Plaintiffs read and relied on PepsiCo's false and misleading Product name (*i.e.,* Gatorade Protein Bar) and misleading claims in its marketing, including labeling, of the Product.

115.    Plaintiffs purchased Gatorade Protein Bars, and paid more for them than they would have paid, believing the Product had qualities they sought (*e.g.,* fomenting athleticism and healthfulness) based on the misleading labeling and marketing; but, the Product was unsatisfactory to them for the reasons described.

116.    Plaintiffs paid more for Gatorade Protein Bars than they would have had they not been misled by the false and misleading labeling and advertising complained of herein. Plaintiffs would not have purchased the Product absent these misrepresentations, or would have purchased them less frequently.

117.    For these reasons, the Gatorade Protein Bars were worth less than what Plaintiffs paid for them.

118.    Plaintiffs purchased Gatorade Protein Bars based on the false and misleading representations described herein.

119.    Instead of receiving products that have materially enhanced their athleticism, or that were healthful and/or advantageous to their well-being, Plaintiffs received products with materially different characteristics.

120.    Plaintiffs lost money as a result of PepsiCo's deception in that Plaintiffs did not receive what they paid for.

121.    Plaintiffs altered their position to their detriment and suffered damages in an amount equal to the amount they paid for Gatorade Protein Bars, and/or the price differential that they paid for the Products.

122.    By engaging in its misleading and deceptive marketing, sales and pricing scheme, PepsiCo reaped and continues to reap increased sales and profits.

123.    PepsiCo is familiar with marketing research and knows that many of its customers purchase Gatorade Protein Bars because they are health conscious and believe that the Product is beneficial to their overall athleticism and/or health and wellbeing.

124.    PepsiCo knows that the overall healthfulness of a product is material to consumers' decision to purchase its Product.

125.    PepsiCo, and its Gatorade and the "Gatorade Sports Medicine Institute" division, deliberately cultivates these misperceptions through its marketing, sales, and pricing scheme. Indeed, PepsiCo relies and capitalizes on consumer misconceptions about Gatorade Protein Bar.

### *Class Allegations*

126.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of two classes.

127.    The class that Plaintiffs Mccausland and Garcia seek to represent (the "California Class") is composed of and defined as follows:

> All persons residing in California who have purchased Gatorade Protein Bars for their own use (which includes for their families), and not for resale, during the liability period. Excluded from the Class are: governmental entities; Defendant; any entity in which Defendant has a controlling interest; Defendant's officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns; and, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

128.    The class that Plaintiff Zurl seeks to represent (the "New York Class") is composed of and defined as follows:

> All persons residing in New York who have purchased Gatorade Protein Bars for their own use (which includes for their families), and not for resale, during the liability period. Excluded from the Class are: governmental entities; Defendant; any entity in which Defendant has a controlling interest; Defendant's officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries,

and assigns; and, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

129.    Collectively, the California and New York classes are referred to as the Classes.

130.    For the purposes of this Complaint, the term "Class Members" refers collectively to all members of the Classes, including the named Plaintiffs.

131.    This action is maintainable as a class action under Federal Rules of Civil Procedure Rule 23(a), and (b)(2) and (b) (3).

132.    **Numerosity.** The Classes each consist of many thousands of persons throughout the States of California and New York. Each Class is so numerous that joinder of all members is impracticable, and the disposition of their claims in a class action will benefit the parties and the Court.

133.    **Commonality and Predominance.** The questions of law and fact common to each Class have the capacity to generate common answers that will drive resolution of this action. They predominate over any questions affecting only individual class members. Common questions of law and fact include, but are not limited to, the following:

a.    Whether PepsiCo contributed to, committed, or is responsible for the conduct alleged herein;

b.    Whether PepsiCo's conduct constitutes the violations of law alleged herein;

c.    Whether PepsiCo acted willfully, recklessly, negligently, or with gross negligence in the violations of laws alleged herein;

d.    Whether Class Members are entitled to restitution and damages.

134.    By seeing the name, labeling, display, and marketing of PepsiCo, and by purchasing Gatorade Protein Bars, all Class Members were subject to the same wrongful conduct.

135.    Absent PepsiCo's material deceptions, misstatements and omissions, Plaintiffs and other Class Members would not have purchased Gatorade Protein Bars, would have purchased fewer of them, and/or paid less for them.

136.    **Typicality.** Plaintiffs' claims are typical of the claims of the Classes, respectively,

because they all purchased Gatorade Protein Bars and were injured thereby. The claims of Plaintiffs and other Class Members are based on the same legal theories and arise from the same false, misleading and unlawful conduct.

137.    **Adequacy.** Plaintiffs are adequate representatives of the Classes because their interests do not conflict with those of other Class Members. Each Class Member is entitled to damages reflecting a similar and discrete purchase or purchases that each Class Member made. Plaintiffs have retained competent and experienced class action counsel, who intend to prosecute this action vigorously. The Class Members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

138.    **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy, because joinder of all Class Members is impracticable. The amount at stake for each consumer, while significant, is such that individual litigation would be inefficient and cost prohibitive. Additionally, adjudication of this controversy as a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the claims asserted herein. Plaintiffs anticipate no difficulty in the management of this action as a class action.

139.    This Court should certify a class under Rule 23(b)(2) and (b)(3) because Defendant has acted or refused to act on grounds that apply generally to the Classes, by making illegal, unfair, misleading and deceptive representations and omissions regarding Gatorade Protein Bars.

140.    **Notice to the Class.** Plaintiffs anticipate that this Court can direct notice to the Classes, to be effectuated by publication  in major media outlets and the Internet.

### FIRST CAUSE OF ACTION
**(On behalf of the California Class)**
**Violation of California Business & Professions Code §§ 17200 *et seq.***
**Unlawful Conduct Prong of the UCL**

141.    Plaintiffs Mccausland and Garcia incorporate by reference all allegations contained in the complaint as if fully set forth herein.

142.    California Business & Professions Code section 17200 ("UCL") prohibits any "unlawful, unfair or fraudulent business act or practice."

143.    The acts, omissions, misrepresentations, practices, and non-disclosures of PepsiCo, as alleged herein, constitute "unlawful" business acts and practices in that they violate the Federal Food, Drug, and Cosmetic Act ("FFDCA") and its implementing regulations, including, at least, the following sections:

      a.  21 U.S.C. § 343, which deems food misbranded when the label contains a statement that is "false or misleading in any particular," with "misleading" defined to "take[] into account (among other things) not only representations made or suggested by statement, word, design, device, or any combination thereof, but also the extent to which the labeling or advertising fails to reveal facts material";

      b.  21 U.S.C. § 321(n), which states the nature of a false and misleading advertisement;

      c.  21 C.F.R. § 101.18(b), which prohibits true statements about ingredients that are misleading in light of the presence of other ingredients; and

      d.  21 C.F.R. § 102.5(c), which prohibits the naming of foods so as to create an erroneous impression about the presence or absence of ingredient(s) or component(s) therein.

144.    PepsiCo's conduct is further "unlawful" because it violates the California False Advertising Law ("FAL") and the Consumer Legal Remedies Act ("CLRA"), as discussed in the claims below.

145.    PepsiCo's conduct also violates the California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Saf. Code section 109875, *et seq.* ("Sherman Law"), including, at least, the following sections:

      a.  Section 110100 (adopting all FDA regulations as state regulations);

      b.  Section 110290 ("In determining whether the labeling or advertisement of a food … is misleading, all representations made or suggested by statement, word, design, device, sound, or any combination of these, shall be taken into account. The extent that the labeling or advertising fails to reveal facts

concerning the food … or consequences of customary use of the food … shall also be considered.");

c. Section 110390 ("It is unlawful for any person to disseminate any false advertisement of any food.... An advertisement is false if it is false or misleading in any particular.");

d. Section 110395 ("It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food … that is falsely advertised.");

e. Section 110398 ("It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded.");

f. Section 110400 ("It is unlawful for any person to receive in commerce any food … that is falsely advertised or to deliver or proffer for delivery any such food...."); and

g. Section 110660 ("Any food is misbranded if its labeling is false or misleading in any particular.").

146.    Each of the challenged statements made and actions taken by PepsiCo violates the FFDCA, FDA regulations, the CLRA, the FAL, and the Sherman Law, and therefore violates the "unlawful" prong of the UCL.

147.    PepsiCo leveraged its deception to induce Plaintiffs and members of the Class to purchase products that were of lesser value and had different characteristics than advertised.

148.    PepsiCo's deceptive advertising caused Plaintiffs and members of the Class to suffer injury in fact and to lose money or property, as it denied them the benefit of the bargain when they decided to purchase Gatorade Protein Bars over other products. Had Plaintiffs and the members of the Class been aware of PepsiCo's false and misleading advertising tactics, they would not have purchased Gatorade Protein Bars at all, would have purchased fewer of them, or would have paid less than what they did for the Product.

149.    In accordance with California Business & Professions Code section 17203, Plaintiffs seek an order enjoining PepsiCo from continuing to conduct business through unlawful, unfair, and/or

fraudulent acts and practices and to commence a corrective advertising campaign.

150.    Plaintiffs also seek an order for the disgorgement and restitution of all monies from the sale of Gatorade Protein Bars that were unjustly acquired through act of unlawful, unfair and/or fraudulent competition, and pray for relief as set forth below.

**SECOND CAUSE OF ACTION**
**(On behalf of the California Class)**
**Violation of California Business & Professions Code §§ 17200, *et seq.***
**Unfair and Fraudulent Conduct Prongs of the UCL**

151.    Plaintiffs Mccausland and Garcia incorporate by reference all of the allegations of the preceding paragraphs as if fully set forth herein.

152.    California Business & Professions Code section 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

153.    The false and misleading labeling of Gatorade Protein Bars, as alleged herein, constitutes "unfair" business acts and practices because such conduct is immoral, unscrupulous, and offends public policy. Further, the gravity of PepsiCo's conduct outweighs any conceivable benefit of such conduct.

154.    The acts, omissions, misrepresentations, practices, and non-disclosures of PepsiCo as alleged herein constitute "fraudulent" business acts and practices, because PepsiCo's conduct is false and misleading to Plaintiffs and members of the Class.

155.    PepsiCo's labeling and marketing of Gatorade Protein Bars is likely to deceive Class Members about the value of the Product as beneficial to their athleticism and/or health and/or well-being.

156.    PepsiCo either knew or reasonably should have known that the name of and other statements on the packaging, labels, and other marketing of Gatorade Protein Bars were likely to deceive consumers.

157.    In accordance with California Business & Professions Code section 17203, Plaintiffs seek an order enjoining PepsiCo from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices and to commence a corrective advertising campaign.

158.     Plaintiffs also seek an order for the disgorgement and restitution of all monies from the sale of Gatorade Protein Bars that were unjustly acquired through act of unlawful, unfair and/or fraudulent competition, and pray for relief as set forth below.

**THIRD CAUSE OF ACTION**
**(On behalf of the California Class)**
**Violation of California Business & Professions Code §§ 17500, et seq.**
**False and Misleading Advertising**

159.     Plaintiffs Mccausland and Garcia incorporate by reference all of the allegations of the preceding paragraphs as if fully set forth herein.

160.     California False Advertising Law Cal. Business & Professions Code sections 17500 and 17508 prohibits "mak[ing] any false or misleading advertising claim."

161.     As alleged herein, PepsiCo, in its labeling of Gatorade Protein Bars, makes "false [and] misleading advertising claim[s]," as it deceives consumers about the value of the Product as beneficial to overall athleticism and/or health or well-being, and/or its true qualities and characteristics.

162.     In reliance on these false and misleading advertising claims, Plaintiffs and members of the Class purchased and used Gatorade Protein Bars without the knowledge that Protein Bars did not have the qualities and characteristics marketed by PepsiCo, including with respect to their effect on overall athleticism and/or health and well-being.

163.     PepsiCo knew or should have known that its labeling and marketing was likely to deceive consumers.

164.     As a result, Plaintiffs and the Class are entitled to equitable relief, restitution, and an order for the disgorgement of the funds by which PepsiCo was unjustly enriched, and pray for relief as set forth below.

**FOURTH CAUSE OF ACTION**
**(On behalf of California Class)**
**Violation of California Civil Code §§ 1750, *et seq.***
**Consumers Legal Remedies Act**

165.    Plaintiffs Mccausland and Garcia incorporate by reference all allegations contained in the complaint as if fully set forth herein.

166.    The CLRA adopts a statutory scheme prohibiting various deceptive practices in connection with the conduct of a business providing goods, property, or services primarily for personal, family, or household purposes.

167.    PepsiCo's policies, acts, and practices were designed to, and did, result in the purchase and use of Gatorade Protein Bars primarily for personal, family, or household purposes, and violated and continue to violate the following sections of the CLRA:

    a.   Section 1770(a)(2), which prohibits representing that goods have a particular composition or contents that they do not have;

    b.   Section 1770(a)(5), which prohibits representing that goods have characteristics, uses, or benefits that do not have;

    c.   Section 1770(a)(7), which prohibits representing that goods are of a particular standard, quality, or grade if they are of another;

    d.   Section 1770(a)(9), which prohibits advertising goods with intent not to sell them as advertised; and

    e.   Section 1770(a)(16), which prohibits representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

168.    As a result, in accordance with  Cal. Civ. Code section 1780(a)(2), Plaintiff and members of the Class have suffered irreparable harm and are entitled to equitable relief in the form of an order:

    a.   Enjoining PepsiCo from continuing to engage in the deceptive practices described above;

      b.   Requiring PepsiCo to make full restitution of all monies wrongfully obtained as a result of the conduct described above;

      c.   Requiring PepsiCo to disgorge all ill-gotten gains flowing from the conduct described above;

      d.   Requiring PepsiCo to provide public notice of the true nature of Gatorade Protein Bars; and

      e.   Finding that Defendant willfully and knowingly violated the CLRA.

169.   Pursuant to Section 1782(b) of the Civil Code, on or about April 5, 2023, Plaintiffs notified PepsiCo in writing of the particular violations of the CLRA (the Notice) and demanded, among other actions, that Defendant cease marketing Gatorade Protein Bars as set forth in detail above. Defendant failed adequately to respond to Plaintiffs' demand within 30 days of the Notice and fully satisfy the requirements therein to bring its conduct into compliance with the law and provide Plaintiff and the Class the relief requested under the CLRA.

170.   Pursuant to CIVIL CODE § 1780(a), Plaintiff and members of the Class seek compensatory damages, punitive damages, restitution, disgorgement of profits, and an order enjoining PepsiCo from deceptively marketing Gatorade Protein Bars, and pray for relief as set forth below.

### FIFTH CAUSE OF ACTION
**(On behalf of the New York Class)**
**Violation of New York General Business Law § 349**

171.   Plaintiff Zurl incorporates by reference all of the allegations contained in this Complaint as if fully set forth herein.

172.   New York General Business Law section 349 prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service."

173.   PepsiCo's labeling and marketing of Gatorade Protein Bars, as alleged herein, constitute "deceptive" acts and practices, as such conduct misled Plaintiff Zurl and other members of the New York Class, as to the nutritional character, value, and/or healthfulness of Gatorade Protein Bars.

174.    As a consequence of Gatorade's deceptive acts and practices, Plaintiff Zurl and other members of the New York Class suffered an ascertainable loss of monies. By reasons of the foregoing, under subsection (h) of N.Y. Gen. Bus. Law section 349, Plaintiff Zurl and other members of the New York Class also seek actual damages and punitive damages.

### SIXTH CAUSE OF ACTION
**(On behalf of the New York Class)**
**Violation of New York General Business Law § 350**

175.    Plaintiff Zurl incorporates by reference all of the allegations of the preceding paragraphs as if fully set forth herein.

176.    New York General Business Law section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service."

177.    New York General Business Law section 350-a defines "false advertising" as "advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect." The section also provides that advertising can be false by omission, as it further defines "false advertising" to include "advertising [that] fails to reveal facts material in the light of such representations with respect to the commodity… to which the advertising relates."

178.    PepsiCo's labeling, marketing, and advertising of Gatorade Protein Bars, as alleged herein, are "misleading in a material respect," and thus "false advertising," as they falsely represent Gatorade Protein Bars as beneficial to athleticism and overall health and well-being.

179.    As a direct and proximate result of PepsiCo's violation of New York General Business Law section 350, Plaintiff Zurl and other members of the New York Class have suffered an ascertainable loss of monies. By reasons of the foregoing, Plaintiff Zurl and other members of the New York Class seek actual damages and punitive damages.

# **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and behalf of members of the Classes, respectfully request the Court to enter an Order:

A.    Certifying the proposed Classes under Rules 23(a), (b)(2), and (b)(3), as set forth above;

B.    Declaring that Defendant is financially responsible for notifying the Classes members of the pendency of this suit;

C.    Declaring that Defendant has committed the violations of law alleged herein;

D.    Awarding statutory damages in the maximum amount for which the law provides;

E.    Awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount that the Court or jury will determine, in accordance with applicable law;

F.    Providing for any and all equitable monetary relief the Court deems appropriate;

G.    Awarding punitive or exemplary damages in accordance with proof and in an amount consistent with applicable precedent;

H.    Awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees;

I.    Awarding pre- and post-judgment interest to the extent the law allows; and

J.    For such further relief as this Court may deem just and proper.

1

2

## **DEMAND FOR JURY TRIAL**

3
Plaintiffs hereby demand a trial by jury on all causes of action or issues so triable.

4

5

6

7
DATED: September 1, 2023                    Respectfully submitted,

8
**JUST FOOD LAW PLLC**

9

10
BY: /s/ Maia Kats              .
Maia Kats (To be admitted *pro hac vice*)

11
maiakats@justfoodlaw.com
5335 Wisconsin Avenue, NW, Ste. 440

12
Washington, DC 20015
Telephone: (202) 243-7910

13

14
**KUZYK LAW, LLP**
Michael D. Braun

15
mdb@kuzykclassactions.com
2121 Avenue of the Stars, Ste. 800

16
Los Angeles, California 90067
Telephone: (213) 401-4100

17
Facsimile:  (213) 401-0311

18

19
*Counsel for Plaintiffs*

20

21

22

23

24

25

26

27

28